Erin Ronstadt, SBN 028362
Jeremy Pekas, SBN 025678
Kristin Cox, SBN 030240
OBER & PEKAS, PLLC
1940 E. Camelback Road, Suite 150
Phoenix, AZ 85016
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@caldwellober.com
Jeremy@caldwellober.com
kristin@caldwellober.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Rasmussen, a married man, | **No.** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Lockheed Martin Group Benefits Plan, an ERISA benefit plan; Life Insurance Company of North America, a plan fiduciary; and Lockheed Martin Corporation, a plan administrator, | |
| Defendants. | |

For his claims against Lockheed Martin Group Benefits Plan, Number 594, (the "Plan"), Life Insurance Company of North America ("LINA"), and Lockheed Martin Corporation ("LM") (collectively "Defendants"), Plaintiff Michael Rasmussen ("Mr. Rasmussen" or "Plaintiff") alleges as follows:

**JURISDICTION, VENUE AND PARTIES**

1.      This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

2.      The Plan is a purported ERISA benefit plan established and maintained by Lockheed Martin for the benefit of its employees. The Plan is a welfare benefit plan that offers group long-term disability ("LTD") benefits.

3.      LM is the Plan Administrator, Plan Sponsor and Employer.

4.     At all relevant times, LINA administered claims for LM under the Plan, acted on behalf of the Plan, and acted as an agent for LM.

5.     The Plan is fully insured by LINA through Group Policy Number LK008348.

6.     At all relevant times, Mr. Rasmussen was a participant and beneficiary of the Plan as an employee of LM.

7.     LM provided certain employees with LTD insurance pursuant to the Plan and other documents comprising the Plan.

8.     At all times relevant, Mr. Rasmussen was an employee of LM and remained a covered individual under the Plan eligible for LTD benefits.

9.     Mr. Rasmussen is and was at all relevant times a resident of Yavapai County, Arizona.

10.     The Plan and LM, a large corporation, have their principal place of business in the State of Maryland. LINA has its principal place of business in the State of Pennsylvania. Defendants LINA and LM are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

11.     This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

12.     Venue is proper in this Court under ERISA, 29 § 1132(e)(1) and 28 U.S.C. § 1391(b).

13.     LM exercised and reserved authority to make final decisions regarding the administration and payment of disability benefits for the Plan. LINA acted as its agent to make final decisions regarding the payment of disability benefits for the Plan and to administer the Plan. Accordingly, Mr. Rasmussen is informed and believes that LM and

-2-

LINA are either a "named fiduciary" of the Plan, pursuant to 29 USC § 1133(2); and/or a "deemed fiduciary" pursuant to 29 USC § 1002 (21)(A); and/or a "designated fiduciary," pursuant to 29 USC § 1105(c)(1)(B).

14.    LINA had actual or apparent authority to act as a fiduciary on behalf of the Plan.

15.    LINA's third-party vendors had actual or apparent authority to act as fiduciaries on behalf of the Plan and administered the Plan in providing services to Defendants.

16.    LM has not properly conferred LINA with the discretionary authority to interpret the Plan and to make eligibility determinations regarding the Plan.

17.    LINA acted under a structural conflict of interest in both administering and paying out on claims under the Plan.

18.    Mr. Rasmussen is entitled to *de novo* review of his claims.

## GENERAL ALLEGATIONS

19.    All previous and subsequent paragraphs are incorporated by reference.

20.    Mr. Rasmussen has extensive training and experience as a high-level engineer and manager. He obtained a Bachelors of Science in Business Management/Production & Operations Management from San Diego State University in 1985. He then earned a Masters degree in Business Administration ("MBA") from National University in 1991.

21.    Mr. Rasmussen worked for COMSAT beginning in 1996 and, following COMSAT's merger with LM, continued his service as part of LM's Global Telecommunications ("LMGT") unit in 2001.

22.    Throughout his employment tenure, Mr. Rasmussen held several positions with LM, attaining an "above Top Secret" security-level clearance with the United States government for his work at LM. Mr. Rasmussen held a Sensitive Compartmented Information ("SCI") clearance, which is a type of classified information controlled

through formal systems established by the Director of National Intelligence. It was one of the highest clearances that a civilian can receive and requires an extensive background check as part of the qualification process.

23.     Mr. Rasmussen received multiple promotions, recognitions, and awards for his hard work throughout the years. He oversaw various programs during his employment.

24.     As of his last day worked on May 31, 2008, Mr. Rasmussen was a Principal Project Engineer, responsible for the oversight of several managers and their subordinates. He was required to direct, coordinate, and exercise functional authority for planning, organization, control, integration, and completion of engineering projects and programs within the area of assigned responsibility, including configuration management, integration and test, personnel management, and process engineering.

25.     Mr. Rasmussen's injuries stem from a 2004 accident wherein a tree fell on him. This occurred while he was attempting to take down a tree with a tractor. Subsequently, the tree fell, striking him on the left side of his head and neck. The tractor overturned, and Mr. Rasmussen became pinned underneath it. He was rendered unconscious. He was helicoptered to a nearby hospital and found to have an L3 fracture, cervical degenerative disc disease, bone spurs, and a head injury. After an extensive recovery, Mr. Rasmussen returned to work.

26.     As time progressed following the 2004 accident, Mr. Rasmussen began to experience increased neck and back pain, as well as intermittent radicular-type pain in his arms and legs. He also began having problems with memory, attention, and concentration secondary to his required use of pain medication and depression.

27.     Special accommodations were made for Mr. Rasmussen to work reduced hours and work from home part of the time. However, his pain became increasingly more severe. He went out on short-term disability three other times before finally stopping work altogether on June 2, 2008.

28.     Leaving work was a very difficult decision that Mr. Rasmussen struggled with for a long time, and he did not want to accept that he could not work.

29.     Mr. Rasmussen was working towards a Masters of Science degree in Engineering at John Hopkins University, which was cut short due to his medical conditions.

30.     On May 29, 2008, Mr. Rasmussen underwent an independent neuropsychological evaluation with Dr. Melissa Carswell.

31.     Due to his medical conditions, Mr. Rasmussen stopped working on or about May 30, 2008 and began receiving short-term disability ("STD") benefits. His employment was terminated effective June 2, 2008.

32.     Mr. Rasmussen received his STD benefits until the maximum allotted time and was then awarded LTD benefits beginning on November 29, 2008.

33.     To qualify for LTD benefits, Mr. Rasmussen must be considered "Disabled." An Employee is Disabled if, because of Injury or Sickness: He or she is unable to perform each and every material duty of his or her regular occupation; and After Monthly Benefits have been payable for 24 months, he or she is unable to perform each and every material duty of any occupation for which he or she may reasonably become qualified based on education, training or experience.

34.     An Employee is Residually Disabled if, during the Benefit Waiting Period and while Disability Benefits are payable, he or she is unable to perform each and every material duty of his or her regular occupation on a Full-time basis."

35.     Mr. Rasmussen was awarded Social Security Disability Insurance ("SSDI") benefits on December 9, 2008.

36.     On April 29 through May 1, 2009, LINA conducted surveillance of Mr. Rasmussen's brother instead of Mr. Rasmussen (the "2009 Surveillance").

37.     As a result of the 2009 Surveillance, on April 30, 2009, LINA terminated Mr. Rasmussen's disability benefits (the "First Denial").

38.     Although LINA learned that it had taken surveillance of the wrong person, it required Mr. Rasmussen to participate in the appeal process.

39.     On July 6, 2009, Mr. Rasmussen secured a functional capacity evaluation ("FCE").  Among other supporting documentation, Mr. Rasmussen submitted that FCE on appeal in support of his inability to work.

40.      LINA had its internal reviewer, Dr. Scott Taylor, conduct a file review on appeal.

41.     Dr. Taylor found that the FCE supported Mr. Rasmussen's inability to perform his own occupation.

42.      Following appeal, LINA overturned its denial on December 9, 2009.

43.     The loss of LTD benefits from May 2009-December 2009 caused severe financial distress and strain on Mr. Rasmussen's life and marriage. During the appeals process, he and his wife separated, and she moved to Arizona. Mr. Rasmussen retained legal counsel to appeal the First Denial.  He had to take money out of his retirement account to pay for attorney fees/costs for the appeal, as well as various expenses associated with the appeal and separation from his wife.

44.     On January 11, 2010, LINA outlined its "claim strategy." It acknowledged that it would need to determine ongoing case management and set a course of action, as well as consider sending the claim to the settlement department.

45.     On February 18, 2010, LINA conducted a life expectancy analysis with the assistance of Dr. John Mendez. LINA calculated that Mr. Rasmussen would live until 71 years old. LINA decided that the claim met a "reserve threshold" and Mr. Rasmussen would be unlikely to return to work before the end of the claim; as such, the claim would be considered for settlement.

46.      On April 19, 2010, LINA made Mr. Rasmussen a settlement offer in the amount of $341,000.00 through his attorney. LINA continued to pursue settling Mr. Rasmussen's claim throughout May and June 2010.

47.     On June 3, 2010, LINA began its investigation into whether Mr. Rasmussen would be disabled from "Any Occupation" under the Plan. On June 10, 2010, it sent Mr. Rasmussen a disability questionnaire to complete and authorization and did not copy his attorney. It continued to try and settle Mr. Rasmussen's claim.

48.     In a telephone conversation on June 15, 2010, Mr. Rasmussen's attorney indicated that $341,000.00 would not be enough to settle the matter, and LINA said it could increase the offer by $50,000.00. His attorney indicated that would likely be insufficient, but that LINA should send the offer to him, so that he could communicate it to Mr. Rasmussen.

49.     On June 15, 2010, LINA raised its settlement offer from $341,000.00 to $400,000.00. Mr. Rasmussen again declined LINA's offer on June 24, 2010.

50.     After Mr. Rasmussen declined LINA's settlement offers, LINA began a crusade to terminate Mr. Rasmussen's LTD benefits.

51.     On July 1, 2010, Mr. Rasmussen's attorney sent a letter to LINA, explaining that he needed to be copied on all communications moving forward. He also provided the disability questionnaire and authorization that LINA had requested on or about June 10, 2010.

52.     On Friday, July 9, 2010, LINA sent Mr. Rasmussen a letter, requesting additional information and medical records within thirty (30) days' time. It also attempted to call Mr. Rasmussen.

53.     On Wednesday, July 14, 2010, LINA again called Mr. Rasmussen and his attorney to follow-up on the letter sent the Friday before. LINA indicated that Mr. Rasmussen was not cooperating with its ongoing claim management efforts. Mr. Rasmussen's attorney noted LINA's "insinuation that [Mr. Rasmussen] is not cooperating with LINA is offensive and that is not accurate."  That same day, he sent out a letter, explaining "in order to avoid any possibility that you will continue to misconstrue situations such as those surrounding your telephone call to Mr. Rasmussen

on July 9, I am now requesting that effective immediately you direct all written and oral communications intended for Mr. Rasmussen to me."

54.     On August 12, 2010, Mr. Rasmussen's attorney called and asked for an extension to provide LINA with medical records until August 23, 2010. LINA agreed.

55.     In a letter dated August 20, 2010, Mr. Rasmussen's attorney provided the medical records that LINA requested in its July 9, 2010 letter. He also provided a vocational report prepared by David A. Festa, MA, CRC, which was dated August 10, 2010 and addressed vocational issues relevant to the standard of disability both under the Plan's "Any Occupation" and "Regular Occupation" definitions of disability.

56.     LINA had a nurse case manager review the medical records to determine functionality on or about September 3, 2010. By September 8, 2010, LINA decided that Mr. Rasmussen's position was actually sedentary, and there was "no medical" to support why Mr. Rasmussen could not perform a sedentary job. After a "second-eye review," LINA decided to once again deny LTD benefits.

57.     LINA denied Mr. Rasmussen's LTD claim for a second time on September 17, 2010 (the "Second Denial").

58.     In order to continue receiving LTD benefits, Mr. Rasmussen had to be disabled from Any Occupation under the Plan as of November 29, 2010.

59.     As part of its Second Denial, LINA reclassified Mr. Rasmussen's occupation from light to sedentary.

60.     In a letter dated November 8, 2010, Mr. Rasmussen's legal counsel submitted an appeal with additional medical documentation, including a vocational report and affidavits from Mr. Rasmussen's providers.

61.     On December 20, 2010, LINA secured a peer review by Dr. Kancheria, who supported that Rasmussen "has significant functional limitations. Available data indicates [claimant] is incapable of [return to work] secondary to chronic pain syndrome,

-8-

chronic use of opiate meds w/cognitive deficits, major depressive disorder w/cognitive deficits."

62.     On January 28, 2011, LINA overturned the Second Denial and reinstated Mr. Rasmussen's LTD benefits into the "Any Occupation" period under the Plan. It reinstated benefits, because its peer review indicated that Mr. Rasmussen was incapable of returning to work at either a sedentary or light level. LINA found it reasonable that Mr. Rasmussen was totally disabled from Any Occupation based on review and appeal documents. LINA decided to send the claim to its settlement department again and, if declined for settlement, would thereafter send the claim to its "stable and mature," or "SAMS," unit based in Dallas, Texas.

63.     In appealing the Second Denial, Mr. Rasmussen again had to hire an attorney and suffered further significant financial and emotional strain, in addition to the debilitating conditions he was dealing with on a daily basis. LINA's discontinuation of his LTD benefits from September 2010-January 2011 contributed to he and his wife remaining separated.

64.     On March 2, 2011, Mr. Rasmussen's claim was sent to the settlement department. His claim was listed as "active-allowed" for settlement and as meeting the "Reserve threshold."

65.     On March 15, 2011, Scott Hornung from LINA's settlement department determined that, based on a file review and subsequent documentation, Mr. Rasmussen's claim did not meet the settlement "criteria." On April 22, 2011, the claim was sent to the SAMS unit and set for an annual medical review.

66.     Mr. Rasmussen decided to move to Arizona part-time to be with his wife and her family in an effort to repair their marriage and better care for his health.

67.     On October 19, 2011, Mr. Rasmussen sent notice to the SAMS unit that he would have a new address in Clarkdale, Arizona from October through April of every year. For the remaining months, he would reside in New York.

68.     Throughout his LTD claim, Mr. Rasmussen often adjusted his pain medications in search of optimum relief and worried about dependency.

69.     On February 20, 2012, Mr. Rasmussen visited his primary care physician, Dr. Arthur. He wanted to decrease his pain medications, because he believed the drugs were contributing to his depression.

70.     On March 13, 2012, LINA initiated its annual benefit eligibility review of Mr. Rasmussen's LTD claim.  On that same day, the claim was assigned to Disability Claim Manager Carol Browning for "SAMS" recertification.

71.     On March 26, 2012, Ms. Browning noted that the current repetitive pay cycle was going to end at the next payment. She updated the pay cycle at that time.

72.     On April 9, 2012, Ms. Browning sent Mr. Rasmussen a disability questionnaire to complete.

73.     On April 26, 2012, Mr. Rasmussen completed the disability questionnaire for LINA.

74.     On May 1, 2012, Ms. Browning received the disability questionnaire via email from Mr. Rasmussen and, at that same time, requested medical records from Dr. Arthur.

75.     Ms. Browning received Dr. Arthur's medical records on May 15, 2012.

76.     LINA conducted a staffing meeting on Mr. Rasmussen's claim on or about May 16, 2012.

77.     During its May 16, 2012 staffing meeting, LINA decided to conduct an "exploratory" Transferable Skills Analysis (the "Exploratory TSA") and, if occupations were identified "up to light," would send Mr. Rasmussen for a two-day FCE with surveillance.

78.     On May 21, 2012, Cigna received the Exploratory TSA results and, "[b]ased on [claimant's] vocational profile, several sedentary occupations and few light

occ[upation]s were found to be appropriate and meet the [work restrictions]. Occupations are in the [management] and engineering industries."

79.     LINA's Special Investigations Unit ("SIU") is responsible for arranging surveillance when requested by claims management.

80.     On June 26, 2012, LINA scheduled the FCE for July 8, 2012.

81.     Ms. Browning requested surveillance for the FCE, but SIU notified Ms. Browning that it would not be able to obtain surveillance on such short notice.

82.     Mr. Rasmussen attended the FCE on July 8, 2012 (the "2012 FCE"). The FCE was completed by a physical therapist Caryn Lindsay, P.T., A.T.C.

83.     On July 11, 2012, LINA received the FCE results and sent those results for evaluation according to the Exploratory TSA that had been conducted earlier in May.

84.     Vocational Rehabilitation Counselor ("VRC") Randall Norris explained that the FCE does not demonstrate enough functionality to perform the occupations identified in the Exploratory TSA. The FCE "gives less than sedentary capability based on ability to sit or stand more than 1 percent of the day."

85.     The 2012 FCE was the second FCE to support Mr. Rasmussen's inability to work in any occupation.

86.     On July 18, 2012, LINA held another staffing meeting regarding Mr. Rasmussen's LTD claim.

87.     As a result of the staffing meeting, LINA decided to conduct surveillance of Mr. Rasmussen, despite the FCE results.

88.     On July 30 through August 1, 2012, LINA conducted surveillance of Mr. Rasmussen (the "2012 Surveillance"). It did not observe any activity.

89.     On August 22, 2012, LINA conducted another staffing meeting to discuss the surveillance, deciding to follow up with additional surveillance in six months.

90.     LINA decided to pursue surveillance in another six months as part of a strategy to deny Mr. Rasmussen's claim without reasonable justification.

91.     From March 13 through March 15, 2013, LINA again conducted surveillance of Mr. Rasmussen (the "2013 Surveillance").

92.     In order to get surveillance footage of Mr. Rasmussen, LINA's third-party surveillance company, PhotoFax, Inc., positioned itself up on a hill above Mr. Rasmussen's property. With magnification lenses, it filmed into Mr. Rasmussen's fenced backyard.

93.     Mr. Rasmussen was recorded engaging in activity on March 13 and March 15, 2013, but he did not leave the house on March 14, 2013.

94.     The activity recorded in the 2013 Surveillance was, in total, less than an hour and a half and not indicative of substantial gainful activity. Mr. Rasmussen performed no activity on March 14, 2013 due to over extending himself the day prior.

95.     On or about April 22, 2013, Ms. Browning discussed the surveillance and Mr. Rasmussen's LTD file with the senior case manager, Leon Farmer. They decided to send Mr. Rasmussen the surveillance for his review, as well as ask additional questions about cognitive testing and treatment by any other doctors.

96.     On or about April 26, 2013, LINA send the 2013 Surveillance to Mr. Rasmussen, asking for a response.

97.     LINA mischaracterized the 2013 Surveillance as proving more functionality than Mr. Rasmussen had previously reported in his previous disability questionnaire.

98.     On or about June 11, 2013, Mr. Rasmussen responded in writing to the 2013 Surveillance.

99.     On or about June 27, 2013, LINA sent the 2009, 2012, and 2013 Surveillance and LTD file to Dr. James Lamprakos, D.O., a peer reviewer for MES Solutions specializing in occupational medicine.

100.   On August 1, 2013, LINA received Dr. Lamprakos' occupational medicine peer report and reviewed the report in accordance with the "DMS Expert Resource Professional Conduct Statement."

101.   As of August 12, 2013, LINA was still checking Dr. Lamprakos' report for "quality assurance" with LINA employee Stephanie Espinal.

102.   On August 14, 2013, LINA learned that it sent the 2009 Surveillance of Mr. Rasmussen's brother to Dr. Lamprakos, as well as the 2012 and 2013 Surveillance.

103.   On August 23, 2013, LINA sent the report back to MES Solutions for "additional handling." It instructed MES Solutions to remove the 2009 Surveillance.

104.   Dr. Lamprakos revised his peer review on or about August 27, 2013.

105.   On September 5, 2013, LINA forwarded the "corrected report" back to Ms. Espinal for further "quality assurance." On September 12, 2013, she found that the corrected report supported Mr. Rasmussen's functionality but that is was incomplete.

106.   On September 16, 2013, LINA "emailed" MES Solutions with instructions on correcting dates and typos in the report.  LINA received the report back from MES Solutions on September 17, 2013. Dr. Lamprakos' report remained dated August 27, 2013.

107.   On September 18, 2013, LINA sent Mr. Rasmussen's file for a Second TSA by Randall Norris, asking for results based solely on Dr. Lamprakos' August 27, 2013 peer report and no other medical records.

108.   The Second TSA identified four occupations total, 1 light and 3 sedentary. All were based on the availability of jobs in Monrovia, Maryland and on Dr. Lamprakos' report.

109.   At the time of the Second TSA, LINA knew that Mr. Rasmussen resided in Clarkdale, AZ.

110.    On September 25, 2013, LINA conducted another staffing meeting of the file. It decided to contact Mr. Rasmussen for a list of his medications, as well as to

-13-

conduct a pharmacy check and refer the claim to its Behavioral Health Services ("BHS") unit for recommendation due to Mr. Rasmussen's cognitive issues.

111.    Mr. Rasmussen provided the information about his medications on September 27, 2013. He also asked why LINA was requesting this information. Ms. Browning wrote back that LINA was "asking for your current medications to review as you indicate the effect of your medications affects your cognitive abilities."

112.    On September 30, 2013, BHS was expressly asked to review only Mr. Rasmussen's medication list in order to assess the impact of medication on Mr. Rasmussen's functionality. BHS deferred assessment to a pharmacist Aeon Munkittrick.

113.    According to Munkittrick in his note dated October 7, 2013, several of the medications for Mr. Rasmussen could cause side effects such as cognitive changes. These side effects usually decrease over time, so the longer someone has been on their medications, the less likely it is that they will experience significant side effects due to tolerance. Due to the fact that everyone reacts differently to medications, Munkittrick explained that LINA must rely on documented clinical findings by the provider in order to identify and quantify any side effects.

114.    On October 9, 2013, LINA had another staffing meeting on the claim. It decided to check with Mr. Rasmussen's current treating doctors and request updated medical records.

115.    After receiving an updated medical record from Dr. Arthur dated September 24, 2013, on November 4, 2013, LINA conducted another staffing meeting on Mr. Rasmussen's claim. During that meeting, LINA decided to send Mr. Rasmussen for a neuropsychological independent medical examination (the "INE") with surveillance. It did not contact Dr. Arthur regarding Mr. Rasmussen's medication side effects.

116.    LINA scheduled INE for December 13, 2013 with Dr. Scott Sindelar.

117.    On January 8, 2014, Carol Browning received the INE and reviewed it with senior case management at LINA. After discussing the report with Leon Farmer, Ms. Borwning decided to request an addendum from Dr. Sindelar regarding work attributes.  However, even with low average to average abilities, LINA determined it was "more likely than not" that Mr. Rasmussen was capable of performing work-related activities. Dr. Sindelar completed the addendum on January 9, 2014, and LINA received the addendum on January 14, 2014.

118.    LINA dictated the addendum to Dr. Sindelar regarding work attributes.

119.    LINA again held a staffing meeting on the claim. In light of the INE and addendum, LINA requested a review of the Second TSA to determine if the four occupations identified were still appropriate given the restrictions and limitations from the INE. LINA found the four occupations to be appropriate, even though they were based in Maryland and not Clarkdale, AZ.

120.    In a letter dated January 21, 2014 LINA terminated Mr. Rasmussen's LTD benefits for a third time (the "Third Denial").

121.    On January 24, 2014, Mr. Rasmussen called LINA, wondering why he received a higher than normal benefit check. Ms. Browning explained that his benefits were being denied.

122.    Mr. Rasmussen, through counsel, requested his claim file in a letter dated February 7, 2014. LINA disclosed the claim file with a letter dated February 12, 2014.

123.    LINA's initial disclosures were deficient, so Mr. Rasmussen, through counsel, sent a second written request for relevant documents in a letter dated March 25, 2014.

124.    LINA responded to the request for relevant documents on March 31, 2014 and sent further information in a letter dated May 5, 2014.

125.    On March 26, 2014, Ms. Browning marked the file to be sent to "closed storage" if no appeal was received.

126.    On May 29, 2014, Mr. Rasmussen requested that the raw testing data from the INE with Dr. Sindelar be sent to his expert, Dr. Marc Walter. After several follow-ups, Dr. Walter did not receive the raw testing data until July 23, 2014.

127.    Mr. Rasmussen timely appealed the Third Denial on November 10, 2014. With his appeal, he responded to LINA's reasons for denial and provided supplemental evidence, including an in-person interview, a declaration and a report by Dr. Walter that responded to Dr. Sindelar's INE.

128.    In a letter dated December 4, 2014, Mr. Rasmussen sent supplemental information regarding a recent orthopedic consultation, at which time the orthopedic surgeon recommended Mr. Rasmussen undergo two additional surgeries due to his degenerative conditions.

129.    In a letter dated December 18, 2014, LINA notified Mr. Rasmussen it would require an additional 45 days for rendering a decision on the claim, because it was waiting for an independent peer review of the file.

130.    In a letter dated January 15, 2015, LINA again wrote to Mr. Rasmussen, explaining that the independent peer review had not been received, and that it hoped to have a completed medical review within four to six weeks.

131.    In a letter dated February 12, 2015, LINA again wrote to Mr. Rasmussen, explaining that the independent peer review had not been received, and that it hoped to have a completed medical review within two to three weeks.

132.    On February 18, 2015, Mr. Rasmussen sent a letter to LINA, urging a determination in order to avoid further irreparable harm to Mr. Rasmussen.

133.    On March 5, 2015, Mr. Rasmussen sent another letter to LINA, demanding a determination by Friday, March 13, 2015 or else reinstatement under a reservation of rights pending further review.

134.    In a letter dated March 3, 2015 but which was mailed and received on March 6, 2015, LINA upheld the Third Denial of Mr. Rasmussen's claim (the "Final Denial").

135.    The Final Denial relied on new evidence unavailable to Mr. Rasmussen during the appeal.

136.    The Final Denial offered a voluntary appeal not provided for in the Plan.

137.    On April 8, 2015, Mr. Rasmussen submitted medical records from two orthopedic surgeons, both independently finding that Mr. Rasmussen needed additional surgical intervention in both his cervical and lumbar spine, with the cervical surgery being most pressing. He also submitted additional, objective medical evidence of peripheral neuropathy and left carpal tunnel syndrome. Mr. Rasmussen requested LINA make a determination by April 24, 2015 or else reinstate his benefits under a reservation of rights while it considers the evidence.

138.    On April 17, 2015, LINA called to ask about whether the SSA had reviewed Mr. Rasmussen's benefits in the last six months and indicated that it was requesting another medical review. LINA agreed to expedite the review but would not provide a date for making its determination. Having exhausted his remedies to bring a claim under 29 U.S.C. § 1132(a)(1)(B), Mr. Rasmussen filed this suit for his benefits (see Count I below).

139.    Under the Plan, Mr. Rasmussen is entitled to receive LTD benefits until he is no longer disabled or until his 65th birthday, which would be December 17, 2024.

140.    The TSAs did not consider the cognitive demands of performing Any Occupation.

141.    Mr. Rasmussen's medical conditions never improved and, in fact, have worsened since first becoming disabled.

142.   Mr. Rasmussen is totally disabled from his regular occupation and any occupation for which he is reasonably fitted by training, education, and experience under the Plan requirements.

143.   Mr. Rasmussen continues to be disabled as defined by the Plan for LTD benefits eligibility.

144.   Mr. Rasmussen's claims are subject to *de novo* review.

145.   Mr. Rasmussen exhausted his administrative remedies under the Plan.

146.   Mr. Rasmussen satisfied all of the jurisdictional prerequisites to filing a claim, and his claim is timely before this Court.

147.   On information and belief, Mr. Rasmussen may be entitled to additional benefits from LM as a disabled employee including, but not limited to, health insurance, life insurance, supplemental LTD benefits, and retirement/pension credits.

## COUNT I
### (Recovery of Plan Benefits)
### (LINA and the Plan)

148.   All previous and subsequent paragraphs are incorporated by reference.

149.   The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.  Defendants are the Plan, Plan administrators, or Plan fiduciaries of the Plan under ERISA.

150.   The Plan represents LTD coverage and a promise to provide LTD benefits until Mr. Rasmussen is no longer disabled under the terms of the Plan.

151.   Mr. Rasmussen became disabled in 2008 and continues to be disabled. He is unable to perform the material and substantial duties of any occupation or any other gainful occupation under the terms of the Plan.  He has claimed the benefits under the Plan to which he is entitled.

152.   Mr. Rasmussen reasonably expected that his conditions met the requirements of Disability as defined by the Plan for LTD benefits, and that he would receive benefits under the Plan until age 65 or until he was no longer disabled.

153.    Despite the coverage of Mr. Rasmussen's disability, Defendants have improperly denied LTD benefits to Mr. Rasmussen in breach of the Plan.  This breach was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence and was clearly erroneous.

154.    LINA's determination that Mr. Rasmussen was not entitled to benefits was influenced by its structural conflict of interest.

155.    LINA improperly targeted Mr. Rasmussen's claim for termination based not on the merits of Mr. Rasmussen's claim but instead to avoid its ongoing financial liability.

156.    LINA unreasonably recorded and relied on surveillance throughout its administration of Mr. Rasmussen's claim, including the 2013 Surveillance, at which time it relied on surveillance footage unlawfully obtained by PhotoFax, Inc.

157.    LINA's surveillance efforts were unreliable, and LINA improperly relied on the surveillance. For instance, the 2009 Surveillance was of Mr. Rasmussen's brother. The 2013 Surveillance included several discrepancies and unexplained lapses in time, undermining its validity and portrayal of Mr. Rasmussen.

158.    LINA failed to meaningfully consider Mr. Rasmussen's SSDI award; although the Social Security Administration had not recently reviewed Mr. Rasmussen's claim, Mr. Rasmussen's conditions are degenerative and have not improved.

159.    LINA's physicians, nurse case managers, vocational reviewers, and other file reviewers failed to meaningfully and collectively address Mr. Rasmussen's conditions.

160.    The TSAs completed by LINA only considered the restrictions and limitations set forth by LINA's biased doctors, Drs. Lamprakos and Sindelar. The TSAs did not consider Mr. Rasmussen's treating providers' opinions, the past FCEs performed on the claim, or the actual medical evidence. As such, the TSAs were "garbage in, garbage out" analyses.

161.    LINA intentionally avoided basing the TSAs on Clarkdale, Arizona and instead chose Monrovia, Maryland, because it knew that a labor market survey would show no job availability.

162.    In terminating Mr. Rasmussen' LTD benefits, LINA disregarded evidence of Mr. Rasmussen's worsening conditions. Mr. Rasmussen's conditions had not changed or improved.

163.    LINA improperly inserted terms into the Plan that substantially altered the definition of disability under which Mr. Rasmussen is entitled to benefits. As an example, the Plan has no requirement for "objective" evidence; yet, LINA improperly demanded "objective medical evidence." By engrafting an "objective medical evidence" requirement into the Plan, LINA relied on that standard in denying Mr. Rasmussen's disability benefits.  This was neither incorporated into the existing Plan definition of "disability," nor was the fact that the standard would be used in the review process disclosed to Mr. Rasmussen until after his LTD benefits were terminated. LINA abused its discretion by considering limitations not present in the Plan to deny coverage. Engrafting terms such as this into the Plan is evidence of LINA's bad faith and conflict of interest.

164.    To the extent that objective clinical findings exist, Mr. Rasmussen's medical evidence is consistent with his complaints and support disability.

165.    LINA improperly failed to consider Mr. Rasmussen's subjective complaints, as well as the effect of his medications, in determining whether he is totally disabled under the Plan.

166.    LINA mischaracterized Mr. Rasmussen as weaning off of pain medications to find that he was not cognitively impaired from his pain medications, which is untrue and against the weight of the medical evidence. LINA failed to consider the impact Mr. Rasmussen's pain medications would have on an ability to work.

167.   Given Mr. Rasmussen's chronic pain, there is no way he can perform the material and substantial duties of any occupation on a consistent basis, regardless of an occupation's sedentary nature.

168.   LINA denied Mr. Rasmussen a full and fair review, in part by failing to provide Mr. Rasmussen with a list of the documents it relied on in denying LTD benefits, by delaying its disclosure of relevant documents, and by failing to address the evidence he provided on appeal.

169.   In the Third Denial, LINA did not give Mr. Rasmussen any meaningful instruction on how to perfect his claim, nor was he told what additional information would help LINA in its decision-making. LINA wrongfully denied Mr. Rasmussen's disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

170.   LINA and its agents acted arbitrarily and capriciously when selectively reviewing Mr. Rasmussen's medical records, relying only on those portions of medical records that would support a denial of benefits.

171.   LINA failed to describe its review procedures.

172.   LINA's numerous procedural errors rise to the level of a "wholesale and flagrant" violation of ERISA, entitling Mr. Rasmussen to *de novo* review.

173.   LINA did not act as a fiduciary in Mr. Rasmussen's best interests.

174.   On information and belief, the peer reviewers were financially incentivized to deny Mr. Rasmussen's claim.

175.   LINA unreasonably used reviewing physicians who were without appropriate knowledge, training, and experience to assess Mr. Rasmussen's disabling conditions.

176.   Dr. Lamprakos' opinion that Mr. Rasmussen "is not physically functionally limited and he does not require any medically necessary work activity restrictions" is unreliable, biased, and unsupported by the evidence.

177.    LINA improperly relied on neuropsychological testing, and Dr. Sindelar biasedly interpreted the testing results against Mr. Rasmussen. In 2008, prior to receiving LTD benefits, Mr. Rasmussen had undergone neuropsychological testing by Dr. Carswell that LINA had in its possession and that yielded results similar to those results reported by Dr. Sindelar. Mr. Rasmussen's claims history and medical records demonstrate that the basis for disability has always been due to physical conditions, and that the psychological and cognitive issues were secondary to these physical issues. There was no reason for LINA to re-test Mr. Rasmussen other than to attempt to diminish his credibility by manipulating validity testing – all the while being cognizant of the documented and statistical probability that Mr. Rasmussen would due "poorly" on the validity testing as a disabled person participating in neuropsychological testing under adverse conditions. The INE should have had no bearing on Mr. Rasmussen's eligibility under the Plan.

178.    MES Solutions, PhotoFax, Inc., and PsyBar, LLC are biased companies, which frequently provide insurance companies with information that is favorable for the denial of claims.

179.    LINA knew or should have known that MES, PhotoFax, Inc., and PsyBar, LLC are biased companies.

180.    On information and belief, as a company-wide practice, LINA uses MES Solutions and PsyBar, LLC because it knows that those companies provide reviews that are favorable to the denial of claims.

181.    LINA unreasonably failed to ensure that MES Solutions and PsyBar, LLC provided unbiased and/or qualified reviewing doctors for purposes of its claims administration.

182.    LINA improperly influenced final peer review reports by drafting portions or the reports or by suggesting changes that were advantageous to a denial of benefits.

183.    LINA's peer reviewers had no reasonable basis for their recommended restrictions and limitations. For instance, Dr. Lamprakos, upon review of multiple diagnostic testing results for Mr. Rasmussen, failed to explain how Mr. Rasmussen's disc bulges, spinal stenosis, and documented radiculopathy equated to no physical limitations whatsoever.

184.    On information and belief, the peer reviewers used in Mr. Rasmussen's claim have been retained by LINA on numerous occasions to conduct claims reviews or other evaluations.

185.    The peer reviewers arbitrarily reached their opinions based on insufficient evidence or investigation. For example, LINA did not provide Dr. Lamprakos with up-to-date medical records.

186.    LINA's peer reviewers misrepresented the records and ignored key evidence. On information and belief, the peer reviewers were not given the Plan or other important records before reaching their conclusions.

187.    LINA's physician reviewers never attempted to speak with Mr. Rasmussen' treating physicians. The peer reviewers, including Drs. Lamprakos, Arias, and Lombardo, never spoke to Mr. Rasmussen, and they never conducted an in-person evaluation of him.

188.    None of LINA's reviewing physicians ever set forth any substantive reasons why Mr. Rasmussen' doctors' opinions that he could not work were incorrect. LINA failed to explain why it credited the physician reviewers over Mr. Rasmussen' treating physicians.

189.    On information and belief, LINA instructs and/or incentivizes certain employee(s) to terminate fully insured LTD claims and appeals, including but not limited to LINA employees Leon Farmer and Carol Browning.

190.    LINA intentionally and in bad faith withheld relevant information in violation of ERISA, such as internal guidelines and other information Mr. Rasmussen

requested on appeal. For instance, it never disclosed the DMS Expert Resource Professional Conduct Statement or discussed this guideline in its May 5, 2014 letter.

191.   LINA handled Mr. Rasmussen's claim in an adversarial manner and failed to administer the Plan prudently and in Mr. Rasmussen's interests.

192.   LINA improperly interpreted the terms of the Plan.

193.   Mr. Rasmussen has exhausted his administrative remedies.

194.   Defendants are not entitled to an arbitrary and capricious standard of review of their decision in this action, so Mr. Rasmussen' claims are entitled to *de novo* review with a bench trial on the record.

195.   On information and belief, LM did not properly confer LINA with discretionary authority to make eligibility determinations under the Plan. Neither LM nor LINA has clarified whether and to what extent LM has delegated LINA with discretionary authority to make determinations under the Plan.

196.   If LINA is entitled to review under an abuse of discretion standard, this Court should review LINA's decision with heavy skepticism, because there is ample evidence of LINA's malice, self-dealing, and biased claims handling as a result of its conflicted status.

197.   On information and belief, LINA has not established any safeguards to insulate its decision-making process against its significant structural conflict of interest.

198.   Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal and state common law, Mr. Rasmussen is entitled to recover all benefits due under the terms of the Plan, and to enforce his rights under the Plan.

199.   Mr. Rasmussen has been seriously harmed by LINA's arbitrary denials. His credit has been ruined, he has been unable to pay for basic living expenses, he has exhausted his savings, and he has foregone necessary medical treatment due to the cost.

His marriage has continued to suffer and his health further declined as a result of LINA's actions.

200.    Mr. Rasmussen is entitled to seek any and all relief allowed pursuant to ERISA, including equitable remedies, in an effort to enforce his rights under the Plan.

201.    Mr. Rasmussen is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of his disability benefits. He is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

202.    Pursuant to 29 U.S.C. § 1132(g), Mr. Rasmussen is entitled to recover his attorneys' fees and costs incurred herein from LINA.

203.    Mr. Rasmussen is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid.

## COUNT II
## (Statutory Penalties)
## (LM)

204.    All previous and subsequent paragraphs are incorporated by reference.

205.    Pursuant to 29 U.S.C. § 1132(c)(1)(B), "any administrator who fails to comply with a request for any information which such administer is required by this subchapter to furnish to a participant or beneficiary… may in the court's discretion be personally liable to such participant or beneficiary."

206.    Under 29 U.S.C. §1024(b)(4), "[t]he administrator shall, upon written request of any participant or beneficiary furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."

207.    On March 12, 2014, Mr. Rasmussen made a written request to LM seeking disclosure of the governing plan documents under ERISA.

208.    On September 11, 2014, Mr. Rasmussen sent a second written request seeking disclosure of governing plan documents under ERISA.

209.    LM responded in writing to Mr. Rasmussen's counsel in a letter dated October 8, 2014 providing incomplete disclosures.

210.    LM failed or refused to comply with its disclosure obligations under 29 U.S.C. § 1024(b).

211.    The disclosure requirements of ERISA are not empty suggestions for fiduciaries such as LM. The disclosure requirements amount to specific guidelines imposed for the purpose of ensuring that plan participants, such as Mr. Rasmussen, can follow and gauge the availability and character of ERISA plans, including the very structure of the benefit plan itself. Without adequate disclosure, Mr. Rasmussen cannot know or enforce his rights to benefits or anticipate alterations in benefits under the Plan.

212.    As the Plan Administrator, LM is liable to Mr. Rasmussen for its failure to properly disclose documents pursuant to 29 U.S.C. § 1132, et. seq.

213.    Under 29 U.S.C. § 1132(c)(1), the Court may impose a statutory penalty of up to $110 per day for each day that LM failed to provide a complete and proper disclosure of Mr. Rasmussen's plan documents.

214.    Penalties began to accrue thirty (30) days after the date Mr. Rasmussen made a written request to LM for his plan documents, which was March 12, 2014.

215.    Mr. Rasmussen is entitled to penalties, as well as interest, costs, and attorneys' fees.

## COUNT III
### (Breach of Fiduciary Duty under 29 U.S.C. § 1132(a)(2))
### (LINA and LM)

216.    All previous and subsequent paragraphs are incorporated by reference.

217.    LINA owes fiduciary duties to the Plan.

-26-

218.   Mr. Rasmussen has reason to believe that LINA breached its fiduciary duties to the Plan, and that the Plan has and will continue to be injured as a result of LINA's conflicted and unchecked claims handling.

219.   In 2010, LINA paid out more in claims that it received in premiums. It received $13,094,696 in premiums from LM to insure the Plan. It paid $14,292,396 in claims and increased its claim reserves by $3,403,328 that year. In total, its incurred claims for 2010 were $17, 695,724. Its claim reserves totaled at $76,604,055.

220.   In 2011, LM paid LINA premiums in an amount of $12,371,968, and while LINA paid $13,220,021, it reduced its liabilities by $1,689,896. Its incurred claims for 2011 were $11,530,305. Its reserves at the end of the year were $61,423,080. All in all, LINA received more premiums than it paid out under the Plan and significantly reduced its incurred liabilities.

221.   In 2012, LM paid LINA $10,137,287, which was less in premiums than the two years prior. LINA also paid less in claims that year, paying $12,133,533 and reducing its liabilities by $871,437. Its incurred claims for 2012 were $11,262,096. Its reserves at the end of the year were $58,389,410.

222.   In 2013, LINA received $13,342,012. It paid $16,672,726 in claims but increased its liabilities by $16,325,528, only incurring claims for 2013 in the amount of $347,198 – drastically less than the premiums it received from LM. Its overall reserves decreased to $57,131,089.

223.   On information and belief, LINA continued to reduce its liability under the Plan in 2014.

224.   On information and belief, LM is no longer paying premiums to LINA for LTD coverage, or alternatively, LINA has continued to significantly reduce its liability under the Plan.

225.   LINA breached its fiduciary duties by acting directly against the Plan for its own gain.

226.   LINA was unjustly enriched as a result of its breach of fiduciary duty violations to the Plan, because it wrongfully withheld benefits for its own profit.

227.   Based on Cigna's 2012 Annual Report, the profitability of LINA's disability products depends on the adequacy of premiums charged and investment returns relative to claims and expenses. The effectiveness of return to work programs and mortality levels also impact the profitability of its disability insurance products.

228.   On information and belief, without the promise of future premiums and having already secured a large payment from LM, LINA's profitability goals directly influenced its handling of all claims insured under the Plan.

229.   On May 13, 2013, LINA entered into a Regulatory Settlement Agreement ("RSA") between itself, including its subsidiary Cigna, and several monitoring states regarding LINA's claims handling practices of group LTD claims.

230.   The RSA resulted from individual examinations by the insurance departments of California, Connecticut, Maine, Massachusetts, and Pennsylvania (the "Monitoring States").

231.   Under the RSA, LINA was assessed with penalties and fees totaling $1,675,000 to the Monitoring States.

232.   Under the RSA, LINA was also required to establish a remediation program for the redetermination of certain previously denied or adversely terminated claims. LINA was required to set aside $77 million for projected payments to claimants under the remediation program.

233.   LINA was also ordered to participate in a 24-month monitoring program involving random sampling and ongoing consultation. Upon completion of the monitoring period, LINA is subject to re-examination.

234.   LINA has a demonstrated history of biased claims handling. It has a pattern and practice of engaging in unfair claims practices, which is evidenced by the 2013 RSA.

235.    LINA's breaches injured the Plan, jeopardized the Plan or put at risk Plan assets. The Plan as a whole incurred an injury as a result of LINA's breaches of its fiduciary duties.

236.    LM acted imprudently by failing to oversee LINA's claims administration. LM, as the Plan Administrator, knew or should have known that LINA handled claims against the best interests of its employees, including Mr. Rasmussen, and not pursuant to the Plan.

237.    On information and belief, LM, as the Plan Administrator, did not periodically review LINA's actions as a purported delegated fiduciary under the Plan.

238.    On information and belief, LM's failure to periodically review LINA's actions as a delegated fiduciary under the Plan was unreasonable and constituted a breach of fiduciary duty.

239.    On information and belief, if LM did periodically review LINA's actions as a delegated fiduciary under the Plan, then its periodic review was unreasonable and constituted a breach of fiduciary duty.

240.    On information and belief, LM is liable for LINA's actions, because LM violated its fiduciary obligations by failing to protect the Plan and Plan Participants from LINA's conflicted, unchecked and adversarial claims handling.

241.    On information and belief, LM knew or should have known that LINA improperly handles claims insured under Plan in an effort to avoid financial liability on LTD claims.

242.    Mr. Rasmussen it entitled to seek relief on behalf of the Plan under § 1132(a)(2), because it may be the only avenue for holding LINA accountable to the Plan in equity.

243.    ERISA "does not elsewhere adequately remedy" the injuries caused to the Plan by LINA's breach of fiduciary duty violations.

244.    On information and belief, an injunction to LINA's claims handling practices with respect to claims insured under the Plan will significantly inure to the benefit of the Plan.

245.    On behalf of the Plan, this Court should enjoin LINA and LM as most appropriately determined upon further discovery, as well as provide other equitable relief this Court deems appropriate.

246.    Mr. Rasmussen is entitled to injunctive and/or mandamus relief under 29 U.S.C. § 1132(a)(2)-(3). He is entitled to enjoin any act or practice by Defendants that violate ERISA or the Plan, and he is entitled to see other appropriate equitable relief that is traditionally available in equity. Because of LINA's breach of fiduciary duties to Plan participants, and because of LM's failure to appropriately monitor LINA and protect Plan participants and beneficiaries from LINA's breaching conduct, LM should be required to implement appropriate procedures in oversight of LINA, which will maintain accountability for the administrative responsibilities it delegates under the Plan.

247.    Pursuant to 29 U.S.C. § 1132(g), Mr. Rasmussen is entitled to recover his attorneys' fees and costs incurred herein from LINA and LM.

### COUNT IV
### (Breach of Fiduciary Duty under 29 U.S.C. § 1132(a)(3))
### (LINA & LM)

248.    All previous and subsequent paragraphs are incorporated by reference.

249.    LINA owes fiduciary duties to Mr. Rasmussen.

250.    LINA failed to discharge its duties with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a).

251.    LINA breached its fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3) and all other pertinent ERISA regulations.

252.    LINA owed Mr. Rasmussen fiduciary duties, and it breached those fiduciary duties by acting directly against Mr. Rasmussen's interests for its own gain.

253.   LINA's conduct was motivated by financial considerations, caused by its structural conflict of interest as both decision maker and payer of Mr. Rasmussen's LTD benefits. LINA has failed to produce any evidence that it protected Mr. Rasmussen from its conflict and instead intentionally withheld information that would have otherwise revealed the depth of its self-interested conduct.

254.   On information and belief, as an institution, LINA uses claim payment reduction goals and cost containment measures as a method of profit-making for the company. In so doing, LINA unfairly and arbitrarily reduces or denies payments on legitimate claims in an across-the-board fashion to attain its numerical reduction goals. LINA's cost containment measures are consistent with and a part of a corporate-wide plan and scheme.

255.   On information and belief, LINA did not have proper safeguards to ensure that its focus on profitability did not affect how its employees handled, evaluated, and assessed Mr. Rasmussen's claim. Any safeguards it did have were not properly followed.

256.   On information and belief, LINA offers incentive or bonus programs to award and encourage employees to meet its savings and operational goals, and it incentivized the employees involved in Mr. Rasmussen's matter to terminate benefits of what was an otherwise legitimate group disability claim.

257.   LINA acknowledged that Mr. Rasmussen was likely to remain disabled over the life of the claim but changed its position when Mr. Rasmussen refused to accept its settlement offers.

258.   LINA breach its fiduciary duties by offering Mr. Rasmussen settlement offers that were less than the reasonable value of his claim.

259.   LINA breached its fiduciary duties by pursuing the 2013 Surveillance after the 2012 Surveillance did not yield any results. There was no reasonable justification for LINA to continue its pursuit of surveillance or for LINA to rely on the 2013 surveillance.

260.   ERISA "does not elsewhere adequately remedy" the injuries caused to Mr.

Rasmussen by LINA's breach of fiduciary duty violations.

261.    LINA acted with malice and in bad faith against Mr. Rasmussen, which constitutes a violation of its fiduciary duty.

262.    LINA arbitrarily and capriciously denied Mr. Rasmussen's benefits, which constitutes a breach of fiduciary duty.

263.    On information and belief, separate equitable relief may be appropriate under 29 U.S.C. § 1132(a)(3), because 29 U.S.C. § 1132(a)(1)(B) is inadequate for recovery.

264.    Mr. Rasmussen is entitled to equitable relief for LINA's breach of fiduciary duties, including for the breaches of fiduciary duties committed by any agents or third parties for LINA.

265.    Mr. Rasmussen relied on the Plan to his detriment, believing that he was entitled to LTD benefits pursuant to the provisions of the Plan.

266.    LINA should return any benefits resulting from its breach to Mr. Rasmussen.

267.    As a direct and proximate result of LINA's breach of fiduciary duty, Mr. Rasmussen suffered actual financial harm and incurred financial expenses.

268.    Mr. Rasmussen is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid in full.

WHEREFORE, Mr. Rasmussen prays for entry of judgment against Defendants as follows:

A.      For all past and future LTD benefits under the terms of the Plan;

B.      Clarifying and determining Mr. Rasmussen's rights to future benefits under the terms of the Plan;

C.      For any statutory penalties that may be available to Mr. Rasmussen as a result of Defendants' violations of ERISA;

D.      For all other equitable relief that is proper as a result of Defendants' breach of fiduciary duties;

E.      For an award of Mr. Rasmussen's attorneys' fees and costs incurred herein;

F.      For an award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

G.      For such and further relief as the Court deems just and reasonable.


Dated this 29th day of April 2015,


OBER & PEKAS, PLLC


By: s/ Erin Ronstadt
        Erin Ronstadt
        Attorneys for Plaintiff

-33-